CHRISTOPHER STEFANONI ET AL. *v.*
IAN M. DUNCAN
(SC 17585)

Borden, Norcott, Katz, Palmer and Vertefeuille, Js.

Argued November 22, 2006—officially released June 19, 2007

*Donald Bruce Hill,* for the appellant (defendant).

*Margaret Stefanoni,* pro se, with whom was *Christopher Stefanoni,* pro se, the appellees (plaintiffs).

*Opinion*

VERTEFEUILLE, J. This appeal arises from an action brought by the plaintiffs, Christopher Stefanoni and Margaret Stefanoni, seeking injunctive and other relief with regard to an access easement and a view restriction over a portion of the real property of their neighbor, the defendant, Ian M. Duncan. The defendant now appeals,

following our grant of certification,[1] from the judgment of the Appellate Court, which reversed in part the judgment of the trial court, concluding that the plaintiffs are permitted to install a proposed metal walkway and dock within the scope of their rights under an access easement and that the view restriction encumbering the defendant's property is to be measured from the bottom floor of the plaintiffs' residence. *Stefanoni* v. *Duncan*, 92 Conn. App. 172, 198–99, 203, 883 A.2d 1271 (2005). We reverse the judgment of the Appellate Court.

The Appellate Court's decision sets forth the following relevant facts. "Holly Pond is a body of salt water forming a part of Long Island Sound located between the city of Stamford and the town of Darien. In the early part of the twentieth century, a dam was erected across the outlet where the pond empties into the sound. The dam prevents the waters of the pond from completely draining into Long Island Sound at low tide. However, the dam does not inhibit the waters of Long Island Sound from entering the pond as the tide rises. Accordingly, the level of Holly Pond is still subject to tidal variations. At low tide, the level of the water in the pond is two feet above the National Geodetic Vertical datum of 1929 (the standard reference elevation for the

---

[1] Both parties sought certification to appeal from the judgment of the Appellate Court. The plaintiffs' petition for certification, which raised the issue of whether the Appellate Court properly affirmed the judgment of the trial court concluding that the defendant had acquired a prescriptive easement for underground sewer and water lines over a portion of the plaintiffs' property, was denied. *Stefanoni* v. *Duncan*, 276 Conn. 935, 890 A.2d 574 (2005). We granted the defendant's petition for certification to appeal, limited to the following issue: "Whether the Appellate Court properly directed judgment for the plaintiffs to permit installation of a walkway, to permit the plaintiffs to wharf out in the defendant's littoral rights area, and to measure the view restriction burdening the defendant's property from the ground floor of the plaintiffs' residence?" *Stefanoni* v. *Duncan*, 276 Conn. 934, 890 A.2d 573 (2006). The Appellate Court's judgment regarding the issue raised in the plaintiffs' petition for certification, the existence of a prescriptive utility easement, therefore is not before us.

area). At mean high tide, the level of the water is 4.2 feet above the same datum. Although the pond is shallow, it is used for boating, to some extent.

"Holly Pond is irregularly shaped. The defendant's property is situated on a cove consisting of several lobes on the eastern shore of the pond. From the defendant's property, the main body of Holly Pond is visible through the channel connecting the cove to the main body and, to some extent, over the low-lying land of the peninsulas forming the cove. Except as blocked by the defendant's residence and trees, the plaintiffs enjoy a similar (albeit, more distant) view of the main body of the pond from the area of their residence. In front of the defendant's lot, the area of the foreshore[2] is very gently sloped, and it is approximately eighty feet in width. That area is largely covered with tussocks of tidal marsh grasses and, although firm, is somewhat uneven in contour.

"In 1972, Elizabeth Wall was the owner of property then known as 77 Nearwater Lane. The property then consisted of the residence now owned by the plaintiffs and situated on a narrow lot approximately 525 feet long by 82 feet wide. The lot was bounded on the east by Nearwater Lane, on the south by property of Margaret Weed Gioseffi, on the west by the waters of Holly Pond and on the north by property now owned by [Doug Calby and Karen Calby]. On June 27, 1972, [Wall] purchased the Gioseffi property, taking title in her name and in the name of her attorney, David S. Maclay, as trustee. The Gioseffi property was also a narrow lot approximately 580 feet long by 76 feet wide. That lot was bounded on the east by Nearwater Lane, on the south by a private road and property now owned by [the Judge family], on the west partially by the waters

---

[2] "In Ballentine's Law Dictionary (3d Ed. 1969), the term 'foreshore' is defined as '[t]he territory lying between the lines of high water and low water, over which the tide ebbs and flows.' " *Stefanoni* v. *Duncan*, supra, 92 Conn. App. 176 n.2.

of Holly Pond and by other property, and on the north by the [Wall property].

"In 1974, through a series of quitclaim deeds prepared by attorney Maclay, [Wall] and [Maclay], as trustee, transferred portions of the former Wall and Gioseffi properties among themselves. After the exchange of deeds, [Wall] owned the lot now owned by the plaintiffs while [Wall] and [Maclay], [as] trustee, owned the lot now owned by the defendant. These deeds created both the utility easement[3] and the access easement.[4]

"In late 1975, [Wall] and [Maclay], [as] trustee, sold the lot now owned by the defendant to Doris Proctor and Barton Proctor. The deed conveying the lot was

---

[3] "The deed conveying what is now the plaintiffs' property to Wall conveyed that property '[s]ubject to an easement appurtenant to the Releasors' property for water, power, telephone, sewer and similar utilities, together with a right of access for maintenance and repair purposes, along the southerly 10 feet of the land shown as being the property of [Wall] on [map no. 3915 in the Darien land records].' The deed conveying what is now the defendant's property to Wall and Maclay conveyed that property '[t]ogether with an easement appurtenant to the Releasees' property for water, power, telephone, sewer and similar utilities, together with a right of access for maintenance and repair purposes, along the southerly 10 feet of the land shown as being the property of [Wall] on [map no. 3915 in the Darien land records].' " *Stefanoni* v. *Duncan*, supra, 92 Conn. App. 177 n.3.

[4] "The deed conveying what is now the plaintiffs' property to Wall [also] conveyed that property '[t]ogether with an easement of way appurtenant to the property of the Releasee running along the northerly boundary of the Releasors' premises 10 feet in width until it reaches a point 60 feet from the mean high water line of Holly Pond at which point it starts widening to a maximum width of 25 feet at said mean high water line, said easement being for access to the waters of Holly Pond, all as shown on [map no. 3915 in the Darien land records].' The deed conveying what is now the defendant's property to Wall and Maclay conveyed that property '[r]eserving, however, an easement of way appurtenant to the property of the Releasor running along the northerly boundary of the demised premises 10 feet in width until it reaches a point 60 feet from the mean high water line of Holly Pond at which point it starts widening to a maximum width of 25 feet at said mean high water line, said easement being for access to the waters of Holly Pond, all as shown on [map no. 3915 in the Darien land records].' " *Stefanoni* v. *Duncan*, supra, 92 Conn. App. 177 n.4.

prepared by attorney Maclay. It described the property as shown on map no. 3915 recorded in the Darien land records. At that time, [Wall] was still the sole owner of the lot presently owned by the plaintiffs. The warranty deed to the Proctors included the utility easement as an appurtenance and noted that it was subject to the access easement. Map no. 3915 depicted the property now owned by the plaintiffs, the property now owned by the defendant, the location of the utility easement and the location of the access easement. The map also contained a notation showing that all of the defendant's property within 100 feet of the mean high water line was a Restricted Area (under § 486.2 of the Darien zoning regulations). The deed to the Proctors also contained the following reservation creating the view restriction: Subject to the restriction that as viewed from a point [five] feet above the elevation of the existing floor of the southwest bedroom of the dwelling located on land of the grantors[5] adjoining the above described premises, the view of the water of the main body of Holly Pond shall not be significantly obstructed by any vegetation or structure (other than an open wire fence) at any point within an area [fifty] feet wide, running along the full length of the northerly boundary of said premise hereby conveyed.

"The deed [to the Proctors, the defendant's predecessors in title] further recited that the property was conveyed together with riparian and littoral rights in the land lying below the mean high water mark of Holly Pond. After this conveyance, [Wall] retained no interest in any property bordering Holly Pond and possessed no riparian or littoral rights with respect to the waters

---

[5] "In a footnote [in its memorandum of decision], the [trial] court noted that of the two grantors (Wall and Maclay), only Wall actually owned adjoining land. It held that this minor discrepancy did not obscure the obvious intention of the deed, at least with respect to the identification of the premises to be benefited by the view restriction." *Stefanoni* v. *Duncan,* supra, 92 Conn. App. 178 n.5.

of Holly Pond." (Internal quotation marks omitted.) Id., 175–78.

"In June, 1977, [Wall] sold the lot now owned by the plaintiffs to Stephen G. Bayer II. The warranty deed to Bayer was not prepared by attorney Maclay. That deed included both the access easement and the view restriction as appurtenances and recited that the premises conveyed were subject to the utility easement. The deed also contained the following additional language: [T]ogether with riparian and littoral rights in the land lying below the mean high water mark of Holly Pond appurtenant to the premises.[6]

"On November 12, 1985, the defendant purchased his property from the Proctors. His warranty deed reflected the existence of the [utility and access] easements and the restriction . . . . At the time the defendant purchased his property, the entire neighborhood, including the plaintiffs' property and the defendant's property, was heavily wooded. The access easement was no more than a pathway through that wooded area. . . .

"On March 1, 1999 . . . Margaret Stefanoni purchased the Bayer property.[7] In late February, 2000, while the defendant was out of town, he received word from friends and neighbors regarding activities being performed by the plaintiffs. Without notice to their neighbors or obtaining the approvals required by the

---

[6] " 'It is fundamental that a grantor cannot effectively convey a greater title than he possesses.' *Stankiewicz* v. *Miami Beach Assn., Inc.*, 191 Conn. 165, 170, 464 A.2d 26 (1983). Accordingly, the [trial] court determined that because 'at the time of the deed to Bayer, Wall no longer owned property adjoining Holly Pond . . . the riparian and littoral right clause of the deed from Wall to Bayer was ineffective to create deeded riparian or littoral rights.' . . . Therefore, the riparian and littoral right clause in the plaintiffs' deed is also ineffective to create deeded riparian or littoral rights." *Stefanoni* v. *Duncan*, supra, 92 Conn. App. 179–80 n.6.

[7] "The [trial] court stated that '[i]n April, 2000, by means of quitclaim deeds through a "straw man," both plaintiffs became the record owners of the property.' " *Stefanoni* v. *Duncan*, supra, 92 Conn. App. 180 n.7.

Darien zoning regulations, the plaintiffs undertook a massive clear cutting of the trees and vegetation on their property. In addition to the plaintiffs' work on their own property, the contractors hired by the plaintiffs performed considerable cutting within the access easement, on other portions of the defendant's lot and on the neighboring Calby property. Although the plaintiffs deny that the cutting was done with the intention of improving their view of Holly Pond, the cutting had that result.

"The plaintiffs' activities took place within 1000 feet of the mean high water line of Holly Pond and consequently were in a regulated coastal area management zone under the Darien zoning regulations. Those regulations require that prior approval from the Darien planning and zoning commission be obtained for such activities within a coastal area management zone. On February 25, 2000, David J. Keating, the Darien zoning enforcement officer, wrote to Margaret Stefanoni, calling her attention to violations of the Darien zoning regulations. In the same letter, Keating demanded that steps be taken to prevent erosion, and that a restoration plan be presented to the planning and zoning commission for approval.

"Enforcement proceedings were subsequently brought by the town of Darien. The defendant and the Calbys intervened as parties to those proceedings. In September, 2000, those proceedings were settled by the parties. Under the terms of the settlement, the plaintiffs agreed, at their sole expense, to landscaping and planting on their property, the defendant's property and the neighboring Calby property in accordance with a plan approved by the town, the Calbys and the defendant. The plaintiffs implemented that plan, including the installation of stepping stones within the access easement. Before the stepping stones were placed, the defendant informed the plaintiffs that he no longer

wanted them installed and requested that the surface of the access easement be left alone. However, the plaintiffs installed the stepping stones. . . .

"In the early summer of 2002, the plaintiffs and the defendant made some efforts to put their differences aside and avoid future controversies. The plaintiffs had acquired an outboard motorboat and expressed a desire to install a permanent dock four and one-half feet wide and forty feet long extending into Holly Pond from the defendant's property and to tie up their boat to the dock. The defendant agreed to the erection of such a dock and to sharing the cost and use of it with the plaintiffs on an equal basis. A draft joint application to the Darien harbormaster was prepared by the plaintiffs and reviewed by the defendant and his attorney. Shortly prior to leaving on a trip to England, the defendant informed the plaintiffs that his attorney had advised him that he should be the sole legal owner of the dock because it was being erected on his land, but that such ownership would not affect the plaintiffs' use of the dock. The plaintiffs took this communication as a sign of bad faith on the defendant's part. Without informing the defendant of their intentions, the plaintiffs filed their own application with the Darien harbormaster for a permit authorizing a floating dock. When the defendant returned from his trip in three weeks, he found the plaintiffs' dock floating in the waters of Holly Pond in front of his property.

"The application that the plaintiffs filed with the harbormaster included an extract from a map prepared by the tax assessor of the town of Darien. The lot lines on the map make it appear that the plaintiffs were the owners, in fee simple, of the access easement area and thereby owned littoral rights in the waters of Holly Pond in front of the easement area.

"Over the next year, the defendant's attorneys and the plaintiffs exchanged correspondence with the Darien

harbormaster and an assistant attorney general of the state regarding the legitimacy of the plaintiffs' permit. On May 8, 2003, assistant attorney general Paul K. Pernerewski advised the harbormaster that in his opinion, the rights granted to the plaintiffs in their deed entitled them to apply for and maintain their floating dock. That opinion, however, was based on the understanding that the plaintiffs were granted, in addition to the rights set forth in the access easement, deeded riparian and littoral rights. The plaintiffs have since acknowledged that no such deeded riparian or littoral rights exist.[8]

"In connection with their proposed improvements in and adjacent to the access easement, the plaintiffs retained the services of Stanley Martin White, a professional engineer. White designed a ninety-six foot long walkway and dock that the plaintiffs propose to erect largely below the mean high water line at the end of the access easement. White testified that the walkway and dock would require pipe foundations to be sunk into the ground both within the access easement and below the mean high water line. The walkway and dock would be removed each fall and reinstalled each spring. White further testified that erection of the walkway and dock would require approval from the department of environmental protection and that if the plaintiffs obtained such an approval, it would be highly unlikely that the defendant would be able to obtain approval to erect his own dock within the area of his littoral rights." (Internal quotation marks omitted.) Id., 179–83. Further facts will be set forth as necessary.

The plaintiffs brought this action claiming, inter alia, that installation of a proposed metal walkway and dock was within their rights under the access easement and

---

[8] The plaintiffs' claims in this action as they relate to the walkway and dock are not based on "riparian and littoral rights" referenced in the deed, but are based solely on those rights associated with their status as holder of the access easement created by the deeds. See footnote 6 of this opinion.

that the view restriction burdening the defendant's property should be measured from the bottom floor of the plaintiffs' residence. The trial court concluded that the construction of the proposed walkway and dock were not permitted uses under the access easement and that the view restriction should be measured from the second floor of the plaintiffs' residence. The plaintiffs appealed from the judgment of the trial court to the Appellate Court. The Appellate Court majority reversed in part the judgment of the trial court, concluding that the plaintiffs' access easement encompassed the right to construct the proposed walkway and dock; id., 198–99; and that the view restriction should be measured from the southwest bedroom on the first floor of the plaintiffs' residence. Id., 203. This appeal followed.

On appeal, the defendant claims that the Appellate Court improperly reversed in part the judgment of the trial court, concluding that the plaintiffs are permitted to install the proposed metal walkway and dock within the scope of their rights under the access easement and that the view restriction is to be measured from the bottom floor of the plaintiffs' residence. Specifically, the defendant asserts that the access easement does not grant the plaintiffs any littoral rights or the right to wharf out into the defendant's littoral rights area and that he maintains exclusive littoral rights to the area adjacent to his upland property. The defendant further claims that the deed contains a latent ambiguity regarding the measurement of the view restriction and that the evidence demonstrated that Wall, who had established the restriction, had intended it to be measured from the second floor, not the first floor of the plaintiffs' residence. In response, the plaintiffs assert that the Appellate Court properly concluded that the access easement grants the plaintiffs the right to install a walkway and dock and that the view restriction should be measured from the first floor of their residence. Specifi-

cally, the plaintiffs assert that the right of access granted by the easement includes the right to wharf out and construct improvements to the use of the easement, including the installation of the proposed walkway and dock. The plaintiffs also claim that that there is no latent ambiguity in the deed, which clearly indicates that the view restriction should be measured from the first floor of their residence, and that therefore, extrinsic evidence is not relevant. We reverse in part the judgment of the Appellate Court.

I

The defendant first claims that the Appellate Court improperly concluded that the language in the deeds that establishes an easement in favor of the plaintiffs across the defendant's property "for access to the waters of Holly Pond" permits the plaintiffs to install the proposed metal walkway and dock. Specifically, the defendant asserts that the access easement does not grant the plaintiffs the right to "wharf out" into the defendant's littoral rights area by constructing a dock[9] and that the walkway is not necessary for access to the pond. The defendant claims, and we agree, that the Appellate Court improperly reversed the judgment of the trial court, which had determined that the construction of the proposed metal walkway and dock were not permitted uses of the access easement.[10]

---

[9] The trial court determined that the plaintiffs had the right to maintain the *floating* dock in Holly Pond in accordance with the terms of the permit granted by the Darien harbormaster until that permit is revoked, canceled or its renewal is denied. The defendant did not challenge that finding on appeal, and accordingly, that issue is not before us. Any reference to "dock" in this opinion does not refer to the floating dock, but to the dock the plaintiffs propose to install at the end of the proposed metal walkway to the pond.

[10] In its memorandum of decision, the trial court stated that "paving or otherwise improving the surface of the path within the access easement would not be an unreasonable exercise of the plaintiffs' rights." The plaintiffs, however, did not propose any specific plan for paving the surface of the path within the easement but, rather, they asserted a right to install the

As an initial matter, we set forth the applicable standard of review. "Although in most contexts the issue of intent is a factual question on which our scope of review is limited . . . the determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary." (Citation omitted; internal quotation marks omitted.) *Eis* v. *Meyer*, 17 Conn. App. 664, 667–68, 555 A.2d 994, aff'd, 213 Conn. 29, 566 A.2d 422 (1989). Nevertheless, "[t]he determination of the scope of an easement is a question of fact . . . [and the] decision as to what would constitute a reasonable use of a right-of-way is for the trier of fact whose decision may not be overturned unless it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Simone* v. *Miller*, 91 Conn. App. 98, 111, 881 A.2d 397 (2005).

In the present case, the trial court determined that the easement does not evince an intent to convey anything more than the right to pass over the area of the easement to reach the waters of Holly Pond. The trial court concluded that "under the access easement the plaintiffs have a right-of-way across a delineated portion of the defendant's property to reach the waters of Holly Pond, and nothing more. Upon reaching the waters of Holly Pond, the plaintiffs have the same rights as any member of the public to use the waters of . . . Holly Pond for any lawful purpose, including swimming, fishing, boating and skating." The trial court further found that the "plaintiffs' right to cross the defendant's property to obtain access to the waters of the pond does not imply any further rights to participate in the exercise of [the] defendant's littoral rights." The trial court therefore concluded that the installation of the proposed metal

---

metal walkway. Therefore, the trial court's consideration was limited to the proposal for the metal walkway and dock.

walkway and dock were not permitted improvements to the access easement.

The Appellate Court reversed the judgment of the trial court in a divided opinion. The majority of the Appellate Court panel determined that, after considering certain factual findings of the trial court, there was a "need" to permit the plaintiffs to install the walkway and dock. *Stefanoni* v. *Duncan*, supra, 92 Conn. App. 190. Judge McLachlan, who dissented with regard to the plaintiffs' claim of the right to install a dock, first pointed out that the trial court did not find that the dock was reasonable or necessary to the plaintiffs' right of access to Holly Pond. Id., 204. He then concluded that the addition of a dock at the end of the walkway unnecessarily would burden the servient estate. Id., 204–205.

We begin with a review of some fundamental principles of the law with regard to easements. "It is well settled that [a]n easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the rules authorized by the easement. . . . [T]he benefit of an easement . . . is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose. . . . [E]asements are not ownership interests but rather privileges to use [the] land of another in [a] certain manner for [a] certain purpose . . . ." (Citations omitted; internal quotation marks omitted.) *Il Giardino, LLC* v. *Belle Haven Land Co.*, 254 Conn. 502, 528, 757 A.2d 1103 (2000). "In determining the character and extent of an easement created by deed, the ordinary import of the language will be accepted as indicative of the intention of the parties, unless there is something in the situation of the property or the surrounding circumstances that calls for a different interpretation." *Oak Leaf Marina, Inc.* v. *Ertel*, 23 Conn. App. 91, 96, 579 A.2d 568, cert.

denied, 216 Conn. 827, 582 A.2d 206 (1990). "The use of an easement must be reasonable and as little burdensome to the servient estate as the nature of the easement and the purpose will permit." (Internal quotation marks omitted.) *Somers* v. *LeVasseur*, 230 Conn. 560, 564, 645 A.2d 993 (1994). "The determination of [the] reasonableness [of the use of an easement] is for the trier of fact . . . ." (Citation omitted.) *Peterson* v. *Oxford*, 189 Conn. 740, 747, 459 A.2d 100 (1983).

We first must consider the scope of the plaintiffs' rights under the access easement in the context of the defendant's littoral rights. This court previously has described the rights of an owner of property adjacent to tidal waters in *State* v. *Knowles-Lombard Co.*, 122 Conn. 263, 188 A. 275 (1936). "The owner of the adjoining upland has certain exclusive yet qualified rights and privileges in the waters and submerged land adjoining his upland. He has the exclusive privilege of wharfing out and erecting piers over and upon such soil and for these purposes of occupying and using it in any manner which does not interfere with navigation . . . ." Id., 265. Our Appellate Court has concluded in the context of a prescriptive easement that "the placement of the docks off the plaintiff's property is an unreasonable increase in the scope of the easement acquired by the defendants and that the placement of the docks significantly burdens the plaintiff's use of the water bordering her property, thereby interfering with her littoral rights." *McCullough* v. *Waterfront Park Assn., Inc.*, 32 Conn. App. 746, 758, 630 A.2d 1372, cert. denied, 227 Conn. 933, 632 A.2d 707 (1993).

Like the Appellate Court, we agree with the courts that have concluded that "the right-of-way to a body of water, alone, does not entitle the grantee to the right to construct a dock or a pier." *Gwynn* v. *Oursler*, 122 Md. App. 493, 500, 712 A.2d 1072, cert. denied, 351 Md. 662, 719 A.2d 1262 (1998). The question is one of the

grantor's intent as to the scope of the easement. On the basis of the trial court's factual findings, which were not found by the Appellate Court to be clearly erroneous, we cannot conclude that the plaintiffs' rights under the access easement encompass the right to construct the proposed metal walkway and dock.

The evidence at trial in the present case demonstrated that the plaintiffs, like the Wall family years earlier, had been able to use the easement area, which was originally a path through the woods, in its natural condition "for access to the waters of Holly Pond" for swimming, ice skating, kayaking, canoeing and boating. The metal walkway and dock proposed by the plaintiffs would require the installation of pipe foundations both above and below the mean water line of Holly Pond, thus encroaching on the defendant's property outside the boundaries of the access easement. The trial court further found that construction of the proposed ninety-six foot walkway and dock would not be limited to the marshland of the easement as the plaintiffs contended. Only the first twenty feet of the ninety-six foot structure would be located within the access easement; the remaining seventy-six feet would be below the mean high water line and, therefore, within the area of the defendant's littoral rights. The trial court further found that, "[a]lthough described as a 'walkway,' the structure would, in fact, be a pier." Moreover, the evidence clearly supported the trial court's finding that the conversion of a path through the woods into a ninety-six foot pier would be substantially burdensome to the defendant's servient estate. The undisputed testimony at trial was that the department of environmental protection likely would permit only one dock to be constructed by the plaintiffs and the defendant. Thus, if the plaintiffs were permitted to install their proposed walkway and dock in the exercise of their rights under the access easement, the defendant would lose his right to wharf out

and erect his own dock in the exercise of his littoral rights. In light of these facts, the trial court properly found that the scope of the easement did not include the right to install the proposed pier.

We disagree with the majority of the Appellate Court that these and other facts found by the trial court support a conclusion that to exercise their rights under the easement the plaintiffs needed to install the walkway and dock. Moreover, the Appellate Court opinion fails to give appropriate weight to the substantial burden that the construction of the pier would likely impose on the defendant, specifically, the loss of some of his littoral rights. The determination of the scope of an easement, which is necessarily fact driven, is itself a question of fact that may not be overturned unless it is found to be clearly erroneous. *Simone* v. *Miller*, supra, 91 Conn. App. 111. For all of these reasons, we reverse the judgment of the Appellate Court with regard to the plaintiffs' right to construct the walkway and dock.

II

The defendant's second claim requires us to determine whether the language in the parties' deeds creating a view restriction that burdens the defendant's property is to be measured from the ground floor or the second floor of the plaintiffs' residence. The defendant claims that the Appellate Court improperly determined that the view restriction should be measured from the southwest bedroom on the first floor of the plaintiffs' dwelling. According to the defendant, the deed contains a latent ambiguity regarding the measurement of the view restriction and the evidence demonstrated that Wall, who had established the easement, had intended the view restriction to be measured from the second floor bedroom. We agree.

We begin by setting forth the appropriate standard of review. "The principles guiding our construction of land conveyance instruments, such as the [deeds] at issue in this appeal, are well established. The construction of a deed . . . presents a question of law which we have plenary power to resolve. . . . A latent ambiguity arises from extraneous or collateral facts that make the meaning of a deed uncertain although its language is clear and unambiguous on its face." (Citations omitted; internal quotation marks omitted.) *Lacic* v. *Thomas*, 78 Conn. App. 406, 414–15, 829 A.2d 1, cert. denied, 266 Conn. 922, 835 A.2d 472 (2003). Latent ambiguity exists where, although language in a deed appears to be certain on its face, it is rendered uncertain when compared to the land that it is purported to describe. See, e.g., *F. & AK, Inc.* v. *Sleeper*, 161 Conn. 505, 510–11, 289 A.2d 905 (1971). "Hence, [a] trial court correctly [may conclude] that [a deed is] rendered uncertain by comparing [it] with the land which [it] purported to describe. . . . The latent ambiguity thus disclosed by parol [evidence] could be removed by parol [evidence]." Id., 511. When there is a latent ambiguity, the meaning of the ambiguous term in a deed is an issue "of fact for the trial court and we cannot disturb its finding, based as it is upon evidence of the surrounding circumstances and the situation of the property, which legally supports it." *Christen* v. *Ruppe*, 131 Conn. 149, 152, 38 A.2d 439 (1944).

We begin with the language of the view restriction. The deed from the plaintiffs' predecessor in title reserved the restriction so that "as viewed from a point [five] feet above the elevation of the existing floor of the *southwest bedroom* of the dwelling located on land of the [plaintiffs], the view of the water of the main body of Holly Pond shall not be significantly obstructed . . . ." (Emphasis added.)

The trial court determined that, when comparing this language with the physical structure of the plaintiffs' house, a latent ambiguity arises because two rooms of the plaintiffs' residence could possibly be the southwest bedroom referred to in the deed. Specifically, the master bedroom suite on the second floor of the plaintiffs' residence has a large window facing southwest and the plaintiffs testified that a room on the ground floor which faces the southwest direction also was being used as a bedroom. The trial court therefore considered extrinsic evidence, including photographs and testimony, in order to determine which bedroom was the one referred to in the deed.

The trial court thereafter found that the southwest bedroom referred to in the deed is the master bedroom on the second floor of the plaintiffs' residence. In making this finding, the trial court relied heavily on the testimony of Maclay, the attorney who had drafted the view restriction and whom the trial court found to be "entirely credible." Maclay testified that Wall had used the second floor master bedroom and the view that she wished to protect was the view from that bedroom. He further testified that Wall had not used the first floor room below the master bedroom as a bedroom when she created the view restriction. The photographic evidence further supported the trial court's finding. From the photographs admitted into evidence, the trial court found that there was a much more expansive view of the pond, particularly the main body of the pond, from the large picture window in the second floor master bedroom than there was from the bedroom on the ground floor. The evidence therefore amply supported the trial court's finding.

The Appellate Court, however, concluded, contrary to the trial court, that there was no latent ambiguity with regard to the meaning of "the southwest bedroom" of the dwelling. *Stefanoni* v. *Duncan*, supra, 92 Conn.

App. 202. We disagree. Although on the face of the deed, "the southwest bedroom of the dwelling" appears clear and certain, the fact that there were arguably two southwest bedrooms in the dwelling gave rise to a latent ambiguity. The trial court therefore properly admitted parol evidence to resolve the ambiguity. The trial court's subsequent finding that the bedroom referred to in the view restriction was the southwest bedroom on the second floor of the home cannot be set aside unless it is clearly erroneous. On the record before us, we cannot conclude that the trial court's finding is clearly erroneous. We therefore reverse the judgment of the Appellate Court with regard to the view restriction.

The judgment of the Appellate Court is reversed in part and the case is remanded with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.